UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RITESH TANDON,<br><br>              Plaintiff,<br><br>      v.<br><br>GN AUDIO USA, INC., et al.,<br><br>              Defendants. | Case No.  5:19-cv-00212-EJD<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 45 |

Plaintiff Ritesh Tandon brought this action against his former employer GN Audio USA Inc.'s ("GN") seeking damages relating to his allegedly wrongful termination.  *See* Dkt. No. 1-1 ("Complaint").  Tandon brings causes of action for (1) discrimination, harassment, and retaliation in violation of the Fair Employment and Housing Act ("FEHA"); (2) wrongful termination in violation of public policy; (3) retaliation in violation of California Labor Code § 1102.5; (4) failure to prevent discrimination, harassment, and retaliation in violation of FEHA; (5) intentional infliction of emotional distress ("IIED"); and (6) negligent hiring, supervision and retention.

Before the Court is GN's Motion for Summary Judgment as to all of Tandon's causes of action pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. No. 45 ("Motion").  The Court took the matter under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons below, the Court **GRANTS** GN's Motion in full.

### I.    Background

Defendant GN is a global company specializing in sound technology, manufacturing speakers, headsets, headphones, and other audio and visual communication solutions.  Tandon was

United States District Court
Northern District of California

a Senior Director in GN's Strategic Alliance group, which was responsible for developing close relationships with GN's large, international corporate partners, such as Microsoft, Cisco, Google, Amazon, and Zoom, among others.  Dkt. No 45-2, Declaration of Holger Reisinger in Support of GN Audio USA Inc.'s Motion for Summary Judgment ("Reisinger Decl."), ¶¶ 8-9.

When Tandon was first hired in 2011, his job focus was to manage GN's partnership with Cisco, where he had worked for several years prior to joining GN.  Declaration of Dipanwita Deb Amar ("Amar Decl.") Ex. A ("Tandon Dep.") 37:14-38:21; *see also* Declaration of David Copeland ("Copeland Decl.") Ex. A (copy of Tandon's offer letter showing his position as "Director of Strategic Alliances (Cisco)").  He reported to GN's Vice President of Strategic Alliances, Chris Briglin, until Briglin left the company in mid-2015.  GN did not replace Briglin, but rather, placed Tandon under the direct supervision of Briglin's supervisor, Holger Reisinger, the Senior Vice President of Office and Large Enterprise Solutions and head of the Strategic Alliance Group.  Reisinger Decl. ¶ 11.  Tandon alleges that when he began reporting to Reisinger he began to experience a diminishing role, was excluded from meetings and company events, and experienced harassment, discrimination, and retaliation by Reisinger and others.

### a.   Tandon's Performance at GN

Around the time that Briglin left in 2015, Tandon was promoted to Senior Director. Reisinger Decl. ¶ 11; Tandon Dep. 53:4-10.  Before Briglin departed, he prepared a PowerPoint slide deck for Reisinger detailing his assessment of the Strategic Alliance managers, including Tandon and his colleagues Anders Terp and Travis Dusek.  Reisinger Decl. Ex. B.  Briglin assessed each employee on a 1-5 scale in certain "core competencies," "contextual skills," and product knowledge.  *Id.*  Tandon received the lowest ratings of the three employees overall.  *Id.* He received a 5 (*i.e.* outstanding) for his "Drive & Commitment to Results," ability to "Think Globally," and "Alliance Development and Management."  He received a 2 (*i.e.*, below expectations) in "Effective Communication Skills," "Strategic Thinking," and "Conceptual Thinking."  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

In September 2015, Reisinger received a complaint from GN's then-Senior Director of Channel and Retail Marketing, Sarah Gray, regarding an unprofessional series of emails that Tandon had sent to members of Gray's marketing team.  Copeland Decl. ¶ 14, Exs. E-F.  After receiving the message and conferring with two of GN's human resources professionals, Reisinger spoke with Tandon regarding the need to communicate more appropriately with his coworkers.  *Id.*  Reisinger also sent an email to Tandon, for his personnel file, documenting the call.  *Id.*

At the end of 2016, Reisinger conducted a performance review of Tandon, and found that he was "outstanding" or "above expectations" in all facets.  Dkt. No. 49-1, Declaration of Ritesh Tandon ("Tandon Decl.") Ex. 8.  Given this positive review, Tandon received an end of year bonus equivalent to 148% of his annual bonus target.

In November 2017, Reisinger received an email from Calum MacDougall, the Senior Vice President of Marketing, complaining about an "unprofessional and incoherent communication from [Tandon]."  Reisinger Decl. Ex. C.  Later that day, Reisinger requested assistance from the human resources team in terminating Tandon.  Reisinger Decl. Ex. D.  On December 15, 2017, Reisinger terminated Tandon for disputed reasons discussed further below.

### b.  Alleged Harassment by Reisinger

According to Tandon, Reisinger gave preferential treatment to Tandon's colleague, Anders Terp, a Director in Strategic Alliances.  Terp is of Danish descent and during all relevant times was located in Copenhagen, where Reisinger was also located.  Reisinger Decl. ¶¶ 11, 29.  Tandon alleges that in 2017 he became aware that Reisinger was holding meetings with all the employees who reported directly to him, including Terp.  Tandon Dep. 114:11-14.  Although Tandon directly reported to Reisinger, he was not invited to these meetings.  Tandon Dep. 106:15-108:24.  Reisinger also allegedly excluded Tandon from a key business meeting at GN's Global Leadership conference.  Tandon Dep. 106:15-108:24, 157:15-158:6.  Tandon alleges that he was the only one of Reisinger's "direct reports" that was not invited to that meeting.  *Id.*

Tandon further alleges that although he was the most senior employee in the Strategic

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Alliances group who reported to Reisinger, Reisinger regularly instructed Terp to run meetings whenever Reisinger was absent, even after Tandon requested the opportunity to run meetings. Tandon Dep. 116:6-118:1. Specifically, Tandon alleges that in 2016 Reisinger asked Terp to run the annual "Enterprise Connect" meeting where the whole Strategic Alliances team discusses the strategy plan for the following year, and asked Terp to participate in drafting the 2017-2019 strategy plan. *Id.* 117:16-21. Reisinger did not offer Tandon equivalent opportunities for growth or leadership within the group. *Id.*

Tandon also asserts that his non-Indian colleague, Mauro Caule, received a significant raise in the summer of 2017, while Tandon did not. Tandon Dep. 182:23-185:11, 191:22-192:3. In April 2017, Tandon received a 3% raise which he attributes to a standard cost of living adjustment. *Id.* 197:6-11. Caule had recently relocated from Italy to Seattle to work more closely with Microsoft. Copeland Decl. ¶ 8. According to David Copeland, GN's Director of Human Resources, Caule received a significant raise to reflect the increased cost of living in the Seattle area. *Id.* When Caule relocated to Seattle he began reporting directly to Tandon. Because Tandon directly supervised Caule, he was aware of and, in fact, approved the raise that Caule received. *Id.* ¶ 10, Ex. D.

Other than Reisinger's alleged favoritism of Tandon's non-Indian colleagues, Tandon also discussed in his deposition a few incidents that he believes demonstrate harassment by Reisinger. First, at a GN conference in the Bahamas in February 2017, Tandon approached Reisinger about a business matter and Reisinger suggested that they discuss it in the lazy river where other team members were hanging out. Tandon Dep. 127:18-129:1; 132:11-133:24. Unbeknownst to Reisinger, Tandon suffered from severe claustrophobia and anxiety and experienced an anxiety attack while in the water. Tandon had to be assisted out of the water by a lifeguard, which he testified was a humiliating experience for him. Tandon Dep. 127:18-129:1; 132:11-135:1; Reisinger Decl. ¶ 31. The second incident occurred at a March 2017 work conference where Terp scheduled a team event on a boat, with Reisinger's approval, even though Tandon would not be

able to participate due to his claustrophobia.  Tandon Dep. 130:16-132:10.  Finally, Tandon testified that in November 2017 he had to leave an Amazon conference in Las Vegas to attend to his father, who had accompanied him on the trip and needed emergency medical attention. Tandon Dep. 245:6-247:15.  Tandon alleges that Reisinger was upset at him for leaving the conference because the next time he and Reisinger spoke, Reisinger did not engage in small talk and spoke in a harsh tone.  Tandon Dep. 248:1-254:9.

### c.  Alleged Harassment by Gray

Tandon also asserts that he was harassed, discriminated, and retaliated against by Gray and members of the marketing team.  It is undisputed that Gray was never a member of the Strategic Alliances team and was never Tandon's supervisor; rather Gray ran the marketing team, which worked alongside Strategic Alliances to facilitate business with corporate clients.

Tandon alleges that from approximately 2011-2015 Gray undermined his work and was openly hostile to him.  For example, Gray would ignore Tandon and change her attitude as soon as he entered a room.  Tandon Dep. 74:13-24, 77:23-79:5.  Tandon alleges that Gray excluded him from meetings related to his alliances and that the marking department, under Gray's direction, purposefully refused to support his projects.  *Id.* 66:7-68:13.  He alleges that he asked Gray to invite him to meetings related to his alliances over 25 times, but nothing changed.  *Id.* 74:13-24. Tandon believes that this was because Gray hates Indians.  *Id.* 78:11-25; 175:5-22.  He recalled Gray making a comment in 2014 or 2015, which he understood to mean that she hated Indians, though he could not remember exactly what she had said.  *Id.* 78:11-79:17.  Tandon reported this comment to Briglin at the time.  *Id.*  Tandon further explained that he believed Gray hated Indians because she was from the United Kingdom and he believed the history between India and the United Kingdom led her to dislike Indian people.  *Id.* 78:11-20.

According to Tandon, Gray repeatedly ignored him in work-related settings.  At a work conference in 2017, Gray greeted each guest at the door of a reception, but she did not greet Tandon and turned away from him when he tried to engage with her.  Tandon Dep. 81:5-82:20.

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

5

United States District Court
Northern District of California

1    Another time, at the global leadership meeting in 2017, Tandon was speaking to GN Vice

2    President of Sales, Mark Derby, but Derby left the conversation to speak to Gray and the two of

3    them laughed in Tandon's direction. *Id.* 84:4-24. Tandon more broadly testified that there were

4    "tons of instances" when Gray ignored him or made facial expressions toward him that he found

5    insulting. *Id.* 81:5-14. Gray allegedly did not show up to the biweekly telephone meetings

6    Tandon set up with the marketing team and did not share the marketing team's budget with

7    Tandon despite his numerous requests. Tandon Decl. ¶ 7.

8          **d. Reporting Caule for stealing Microsoft information**

9         Tandon's direct report Caule worked closely with Microsoft in the Seattle area. As part of

10    that relationship, Caule was granted "badge access" at Microsoft. The badge access enabled Caule

11    to enter the Microsoft campus and access Microsoft's intranet while there. According to Tandon,

12    Caule used his intranet access to view Microsoft's confidential information, such as "sales

13    pipeline information" and information regarding new Microsoft projects. Tandon Dep. 136:10-

14    140:14. Tandon acknowledges that Microsoft intentionally granted Caule access to the intranet,

15    however, he believes that Caule had access to a greater amount of information than Microsoft

16    intended to give because "no companies give such access and information." Tandon Dep. 149:6-

17    149:20. Caule sent this Microsoft information to Tandon, Reisinger, and other GN executives.

18    Tandon believed Caule's actions amount to stealing confidential information. He complained to

19    Reisinger approximately three times about his belief that Caule was stealing confidential

20    information, but his complaints all went unanswered. *Id.* 150:9-153:6.

21         Tandon developed severe anxiety related to what he believed to be Caule's illegal actions.

22    In February 2017, Tandon was admitted to the emergency room as a result of the stress and

23    anxiety he was suffering. Tandon Dep. 24:13-16, 129:23-130:15; Ex. 32.

24          **e. Refusing to Provide Google with "Monkey Code"**

25         Tandon testified that between June and November of 2017, Google and GN were working

26    together on an opportunity for the two companies to share device software as part of a larger

27

28    Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

business contract.  Tandon Dep. 224:24-230:13.  As part of that project, Google requested that GN put certain software code related to GN handsets "in the escrow."  *Id.*  GN's engineering team was reluctant to provide the code, so according to Tandon, Reisinger asked Tandon to provide Google with fake code, known as "monkey code."  Tandon refused to do so because he understood Reisinger's request to be immoral and "highly illegal."  *Id.* 227:18-230:13.  The Google deal subsequently fell through.  Reisinger later told Tandon that he was upset that they had lost the Google deal, which Tandon understood to mean that Reisinger was upset with him for refusing to provide Google with monkey code.  *Id.* 232:12-25.

### f.   Termination

On December 15, 2017, Reisinger called Tandon and told him that him that his position had been eliminated and his employment was therefore terminated.  Reisinger testified in his deposition that GN Global Management Team had adopted a three-year strategic plan for the 2017-2019 period during which the company would shift its focus from a hardware-based business to a software-based business.  Amar Decl. Ex. C ("Reisinger Dep.") 94:1-95:13.  The Global Management team had observed that its customers who previously used GN's headsets to connect to Cisco desktop phones were now using GN's headsets and speakers to connect directly to laptops or software programs from Microsoft, Zoom, Google, etc.  *Id.* 49:14-50:12; 94:1-95:13.  As a result of the shift in GN's focus, partnerships with companies in the software industry (like Microsoft, Zoom, and Amazon) became more important to the Strategic Alliance business.  Partnerships with hardware-based businesses like Cisco—Tandon's primary account—became less important.  *Id.* 48:25-49:13; 54:18-56:10; 94:1-95:13.

Tandon's position was the only position eliminated as part of Reisinger's implementation of the new strategy plan.  *Id.* 101:20-102:14.  According to Reisinger, his decision to eliminate Tandon's position as part of this shift in strategic focus was based on several considerations.  *Id.* 94:6-97:14.  Reisinger wanted to restructure the Strategic Alliances team to remove the "middle management layer" and to allow team members to take responsibility for entire business units

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

rather than one or a few specific accounts.  *Id.*  Reisinger believed Tandon's primary role was to manage the Cisco account, which was of diminishing importance to the company.  *Id.*  He also considered the changing skillset required to contribute to a more software-focused strategy, which he did not believe Tandon to have.  Finally, he questioned Tandon's leadership capabilities, collaboration skills and ability to work with minimal supervision, given the complaints that Reisinger had received about Tandon from colleagues.  *Id.*

About one month before Reisinger terminated Tandon, he emailed Copeland in human resources to request assistance with the logistics of terminating Tandon, including "recruitment of replacement" and "legal authority."  Dkt. No. 49-1, Declaration of Stephanie Le ("Le Decl.") Ex. 22.  In that email, Reisinger notes that his hands were full with "damage control" and management of Tandon's job duties, including alliances with Cisco, Google, and Microsoft.  *Id.*

Following Tandon's termination, Reisinger drafted an email to notify the group of Tandon's departure.  The email states: "Stephan Keim will cover any open items and transition from Ritesh's responsibilities for the Cisco partnership and their alliance partners."  Reisinger Decl. Ex. E; *see also* Reisinger Decl. ¶ 18.  GN asserts that no new employees have been hired to fill Tandon's position and that Keim still covers the Cisco partnership.  Reisinger Decl. ¶ 25.

### g.  Procedural History

Tandon filed his first written complaint, or "charge" with the Department of Fair Employment and Housing ("DFEH") on April 13, 2018.  *See* Defendant's Request for Judicial Notice ("RJN"), Ex. A.[1]  In his first charge, Tandon alleged that he was subject to discrimination

---

[1] GN requested that the Court take judicial notice of Plaintiff's DFEH charges.  Plaintiff does not oppose this request.  The Court takes judicial notice of the DFEH charges because "they are public records whose accuracy is not in dispute."  *Dornell v. City of San Mateo*, 19 F. Supp. 3d 900, 904 (N.D. Cal. 2013).

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

based on race because Reisinger did not invite him to his "direct report" meetings and because Tandon was Reisinger's only Indian direct report and the only one terminated. *Id.* Tandon later filed multiple amended charges, alleging more broadly that he was harassed, discriminated against, and retaliated against because of his race, national origin, color, or because he complained about discrimination or harassment. RJN Exs. B-D.

On December 4, 2018, Tandon filed his Complaint, asserting six causes of action: (1) discrimination, harassment, and retaliation in violation of FEHA; (2) wrongful termination in violation of public policy; (3) retaliation in violation of California Labor Code § 1102.5; (4) failure to prevent discrimination, harassment, and retaliation in violation of FEHA; (5) intentional infliction of emotional distress; and (6) negligent hiring, supervision and retention. Compl. ¶¶ 16-50. In his Complaint, Tandon originally named GN, Jabra, GN Netcom, Inc., Hello Direct, Inc., Holger Reisinger, Dave Copeland, Sarah Gray, and Mark Derby as defendants. *Id.* Tandon subsequently voluntarily dismissed Hello Direct, Inc., Reisinger, Copeland, Gray, and Derby. *See* Dkt. Nos. 20, 31, 36. Moreover, neither "Jabra" nor "GN Netcom, Inc." are separate corporate entities. *See* Notice of Removal, Dkt. No. 1 at 4.

GN brough the present Motion for Summary Judgment as to all claims. Tandon opposes the Motion. Dkt. No. 49, Plaintiff's Opposition to Motion for Summary Judgment/Adjudication ("Opposition").

## II. Legal Standard

A court must grant summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to satisfy this burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the

United States District Court
Northern District of California

1   court that there is no genuine issue of material fact." *Id.*

2        If the moving party meets its burden of production, the nonmoving party must produce

3   evidence to support its claim or defense. *Id.* at 1103.  To defeat a summary judgment motion, the

4   non-moving party may not merely rely on its pleadings or on conclusory statements. *Celotex*

5   *Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Nor may the non-

6   moving party merely attack or discredit the moving party's evidence. *See Nat'l Union Fire Ins.*

7   *Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).  The non-moving

8   party must affirmatively present specific admissible evidence sufficient to create a genuine issue

9   of material fact for trial. *Celotex Corp.*, 477 U.S. at 324.  If the nonmoving party fails to produce

10  enough evidence to create a genuine issue of material fact, Rule 56(c) mandates the moving party

11  win the motion for summary judgment. *See id.* at 322.

12  **III.    Discussion**

13            **a.  Age-Based Claims**

14       GN first argues that Tandon has failed to establish a FEHA claim based on age

15  discrimination, retaliation, or harassment because he has not exhausted his administrative

16  remedies as to that claim.

17       Before a plaintiff may assert a claim under FEHA, he must first file a written complaint

18  within one year of the alleged unlawful conduct with the DFEH. Cal. Gov't Code § 12960(b), (d)

19  & (e); *Rodriguez v. Airborne Express*, 265 F.3d 890, 896–97 (9th Cir. 2001) (citations omitted).

20  "The scope of the written administrative charge defines the permissible scope of the subsequent

21  civil action . . . Allegations in the civil complaint that fall outside the scope of the administrative

22  charge are barred for failure to exhaust." *Id.* at 897 (citations omitted).  Allegations in a civil

23  complaint are within the scope of a DFEH charge if they are "like or reasonably related to" the

24  allegations in the charge. *Id.*

25       Tandon filed his first charge with the DFEH on April 13, 2018, alleging that he was

26  subject to discrimination based on race because Reisinger did not invite Tandon to his "direct

27

28  Case No.: 5:19-cv-00212-EJD
    ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   report" meetings and because Tandon was Reisinger's only Indian direct report and the only one

2   terminated.  *See* Defendant's Request for Judicial Notice ("RJN") Ex. A.  Tandon later filed

3   multiple amended charges, alleging more broadly that he was harassed, discriminated against, and

4   retaliated against because of his race, national origin, color, or because he complained about

5   discrimination or harassment.  RJN Exs. B-D.

6       Tandon argues that these allegations are "like or reasonably related to" his age-based claim

7   because DFEH charges are to be liberally construed.  Opp. at 10, n.1.  Even liberally construing

8   the allegations in Tandon's DFEH charges, the Court does not find that allegations of race or

9   national origin discrimination are reasonably related to allegations of age discrimination.  *See*

10  *Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044, 1051 (9th Cir. 1987) (affirming district court's

11  finding that plaintiff had not exhausted remedies as to age discrimination where the plaintiff's

12  DFEH charge did not mention "age" or "include any allegations of . . . age discrimination.").

13      GN's Motion is, therefore, GRANTED as to Tandon's age-based FEHA claims.

14      **b.  FEHA Claim**

15      In evaluating discrimination claims under FEHA, courts apply the *McDonnell Douglas*

16  three-part burden-shifting framework.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49, 124 S. Ct.

17  513, 157 L. Ed. 2d 357 (2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct.

18  1817, 36 L. Ed. 2d 668 (1973)); *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354, 8 P.3d 1089

19  (2000).  Under this framework, the plaintiff must first establish a prima facie case of

20  discrimination.  The burden then shifts to the employer to offer a "legitimate, nondiscriminatory

21  reason for the adverse employment action."  *Deschene v. Pinole Point Steel Co.*, 76 Cal. App. 4th

22  33, 44, 90 Cal. Rptr. 2d 15 (1999), *as modified* (Nov. 29, 1999).  If the employer offers such a

23  reason, the "plaintiff must offer evidence that the employer's stated reason is either false or

24  pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each

25  which would permit a reasonable trier of fact to conclude the employer intentionally

26  discriminated."  *Id.*; *see also Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir.

27

28

United States District Court
Northern District of California

1   2001).

2                              **i. Discrimination**

3          To establish a prima facie case of discrimination based on race or national origin, Tandon

4   must establish that (1) he was a member of a protected class; (2) he was performing competently

5   in the position he held; (3) he suffered an adverse employment action, such as termination; and (4)

6   some other circumstance suggests discriminatory motive.  *Guz*, 24 Cal. 4th at 355.

7          GN does not contest that Tandon can establish the first three of these requirements but

8   argues that he cannot establish a prima facie case of discrimination because "there are no

9   circumstances that suggest GN acted with any discriminatory motive when terminating his

10  employment."  Mot. at 11.  GN maintains that Tandon was terminated for a combination of

11  legitimate reasons having nothing to do with Tandon's race, national origin, or ancestry.

12  According to GN, Tandon's position was eliminated as part of the company's strategic plan to

13  shift its focus from a hardware-based business to a software-based business, which made accounts

14  like Cisco—Tandon's primary account—less important.  Reisinger Decl. ¶ 16.  This shift toward a

15  software-based business also required employees to have a strong understanding of software, a

16  skill which Reisinger did not perceive Tandon to possess.  Reisinger Decl. ¶ 17.  Moreover,

17  Reisinger was aware of numerous, documented complaints regarding Tandon's communication

18  style and inability to work collaboratively with coworkers, including complaints from high-level

19  employees.  Reisinger Decl. ¶¶ 12, 19.  Given these complaints and the fact that Tandon primarily

20  focused on an area of diminishing importance to the company, Reisinger made the decision to

21  eliminate Tandon's position.  *Id.*

22         In his Opposition, Tandon states that "there were circumstances suggesting that [GN] acted

23  with a discriminatory motive, by the numerous examples above, including that Tandon's

24  replacement is Caucasian."  Opp. at 11.  Tandon does not cite to any evidence in the record or

25  identify specific "examples above" that might illustrate these circumstances.  Indeed, the only

26  allegations that relate to Tandon's race, national origin, or ancestry are that Reisinger excluded

27  Case No.: 5:19-cv-00212-EJD

28  ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   Tandon, the only Indian employee reporting to Reisinger, from meetings and that Tandon's non-

2   Indian colleagues received preferential treatment.  *See* Opp. at 3 ("Tandon felt that Reisinger was

3   continuously pushing Terp to go above and succeed, while limiting Tandon's opportunities for

4   success"); *id.* at 7 ("Tandon believed he was being excluded from these key meetings because he

5   was the only direct report of Asian/Indian descent under Reisinger").

6          Tandon does not offer any evidence to indicate that there is a causal connection between

7   the fact that he is Indian and the fact that he was excluded from certain meetings or the fact that

8   his colleague was given more opportunities.  That Tandon happens to be Indian and the four other

9   employees directly reporting to Reisinger are not, is not by itself enough to indicate a

10  discriminatory motive.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005)

11  (finding in the Section 1983 context that "the mere fact that [plaintiff] is Native American and

12  certain City council members and administrators are not, standing alone, does not mean that

13  Defendants have discriminated on the basis of race"); *Aragon v. Republic Silver State Disposal

14  Inc.*, 292 F.3d 654, 663 (9th Cir. 2002), *as amended* (July 18, 2002) (evidence that three of four

15  laid-off employees were white "presents no stark pattern, nor does it account for possible

16  nondiscriminatory variables, such as job performance"); *Gonzales v. Metpath, Inc.*, 214 Cal. App.

17  3d 422, 427–28, 262 Cal. Rptr. 654 (Ct. App. 1989) (summary judgment granted where plaintiff's

18  case was "based upon the claim that when an employer differentiates between two employees, and

19  the two happen not to be of the same gender, or racial background, or religion, or nationality, or

20  ancestry, etc., then the act of discriminating between the two is unlawful").  The Court, therefore,

21  finds that Tandon has "failed to establish a prima facie case of discrimination on the basis of race

22  or national origin because he failed to offer any evidence of 'circumstances that suggest a

23  discriminatory motive.'"  *Buhl v. Abbott Labs.*, 817 F. App'x 408, 410 (9th Cir. 2020) (citing

24  *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1242 (9th Cir. 2013).

25          The only other argument that Tandon makes to support of his claim that GN acted with a

26  discriminatory motive is that "Tandon's replacement is Caucasian."  Opp. at 11.  As an initial

27

28

United States District Court
Northern District of California

1    matter and as discussed further below, Tandon offers no evidence indicating that he was replaced.

2    The undisputed evidence indicates that Stephan Keim, an existing employee in the Strategic

3    Alliances group, took over Tandon's responsibilities on the Cisco account when Tandon was

4    terminated.  *See* Reisinger Decl. Ex. E.  To the extent Tandon argues that the fact that Keim is

5    Caucasian indicates that GN had a discriminatory motive in terminating Tandon, the Court finds

6    that fact of limited use in establishing circumstantial evidence of discrimination for the same

7    reasons stated above.  Moreover, this allegation seems to bear more significantly on whether GN's

8    proffered rational for terminating him was pretextual, not whether it acted with a discriminatory

9    motive.  The Court need not reach the question of whether Tandon can prove pretext because he

10   has not established a prima facie case of discrimination.

### ii.  Retaliation

12          FEHA's anti-retaliation provision makes it unlawful "[f]or any employer . . . to discharge,

13   expel, or otherwise discriminate against any person because the person has opposed any practices

14   forbidden under this part."  Cal. Gov't Code § 12940(h).  The elements of a prima facie case for

15   FEHA retaliation are: (1) the employee engaged in protected activity; (2) the employee was

16   subjected to an adverse employment action; and (3) a causal link between the protected activity

17   and adverse action.  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042, 116 P.3d 1123 (2005).

18          "To constitute protected activity, a complaint must be based on an employee's 'reasonable

19   belief that the employer has engaged in an unlawful employment practice.'"  *Pinder v.*

20   *Employment Dev. Dep't*, 227 F. Supp. 3d 1123, 1147 (E.D. Cal. 2017) (quoting *Freitag v. Ayers*,

21   468 F.3d 528, 541–42 (9th Cir. 2006); *see also Yanowitz*, 36 Cal. 4th at 1043 (explaining that the

22   employee must "reasonably believe" he is opposing discriminatory conduct even if he proves to be

23   incorrect).

24          "The causal link may be established by an inference derived from circumstantial evidence,

25   'such as the employer's knowledge that the [employee] engaged in protected activities and the

26   proximity in time between the protected action and allegedly retaliatory employment decision.'"

27
28

*Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 615, 262 Cal. Rptr. 842 (Ct. App. 1989).  The causation required for the third element may be "inferred from timing alone where an adverse employment action follows on the heels of protected activity."  *Pinder*, 227 F. Supp. 3d at 1147 (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008); *Loggins v. Kaiser Permanente Internat.*, 151 Cal. App. 4th 1102, 1112–13, 60 Cal. Rptr. 3d 45 (2007))).

Tandon alleges that he engaged in protected activity because he "complained upwards to 25 times regarding the overtly hostile work environment he was subjected to based on Gray's behavior towards him, including her referencing that she 'hates Indians.'"  Opp. at 12.  GN acknowledges that Tandon complained about Gray to his former supervisor, Briglin, but disputes that Tandon complained to Reisinger or that Tandon complained 25 times.  GN also argues that even if Tandon's complaints about Gray constitute protected activity, they all occurred in or before 2015 and are too temporally removed from Tandon's termination at the end of 2017 to infer a causal connection.  Mot. at 13.

In Tandon's deposition, he testified that "from the year 2011 to 2015 when [Gray] was running the EMEA region part" he asked Gray to invite him to meetings regarding his accounts "at least more than 20 to 25 times."  Tandon Dep. 74:13-24.  He also testified that he told Briglin about Gray's comment that made Tandon believe that Gray hated Indians (*Id.* at 79:14-22), and that he specifically complained to Reisinger that Gray targeted him and discriminated against him because he is Indian.  *Id.* at 97:10-97:17 (explaining that at some point in 2015 or 2016 he told Reisinger "I am Indian; that's why she don't like me").  While the parties dispute the nature and number of Tandon's complaints regarding Gray, the Court finds that Tandon's testimony could lead a reasonable juror to believe that he engaged in protected activity.

Whether Tandon can establish a causal connection between that activity and his termination in 2017 is less clear.  Tandon testified that after he complained to Reisinger, nothing changed about Gray's behavior and, in fact, Reisinger also began excluding him from key meetings.  While these perceived slights may not rise to the level of adverse employment action,

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

the Court finds they demonstrate circumstances from which a jury could conclude that Reisinger retaliated against Tandon because of Tandon's protected activity.  *See Yanowitz*, 36 Cal. 4th at 1055 ("there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries.").  Thus, the Court finds that Tandon has sufficiently established a prima facie case of FEHA retaliation.

### iii.   Pretext

Because Tandon has established a prima facie case of FEHA retaliation, the burden shift to GN to show a legitimate, nondiscriminatory reason for the adverse employment action.  As discussed above, GN has articulated numerous legitimate, non-retaliatory reasons for why Tandon was terminated, including that his position was eliminated as part of a strategic shift in focus, his skillset and primary account were of diminishing importance given the changing strategic focus of the team, and he had demonstrated a difficulty collaborating with others.  Reisinger Decl. ¶¶ 16-19.

The burden thus shifts to Tandon to show that these reasons are false or pretextual, such that a jury could conclude that GN acted with discriminatory intent.  *Deschene*, 76 Cal. App. 4th at 44.  Tandon must offer "specific and substantial" evidence to defeat summary judgment.  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998), *as amended* (Aug. 11, 1998); *see also Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 75, 105 Cal. Rptr. 2d 652 (2000) (to establish pretext, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence").

Tandon first argues that "Defendants' shifting stories and reasons for Tandon's termination is evidence of pretext."  Opp. at 16-17.  Tandon testified that when he was terminated, Reisinger told him that it was because his position had been eliminated.  He argues that it was not until later that GN asserted that the elimination of his position was due to a reorganization of the group, and that it was not until this lawsuit commenced that GN mentioned any performance deficiencies.

United States District Court
Northern District of California

1    To support a claim of pretext through "shifting reasons," it is insufficient for a plaintiff to

2    merely show that an employer's explanations have "shifted;" rather, he must show that the stated

3    explanations are incompatible, inconsistent, or conflicting. *Villiarimo v. Aloha Island Air, Inc.*,

4    281 F.3d 1054, 1063 (9th Cir. 2002) (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733–34

5    (7th Cir. 2001) (explaining that pretext can be demonstrated by "shifting . . .conflicting, and at

6    times retracted, justifications for adverse treatment," but not where an employer "simply

7    supplemented its explanation," where "there has been no retraction of any of its reasons," nor

8    where none of its reasons are "inconsistent or conflicting")); *see also Nidds v. Schindler Elevator*

9    *Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (finding that the reasons given by the employer for

10   laying off plaintiff were "not incompatible, and therefore not properly described as 'shifting

11   reasons,'" nor were the discrepancies in the employer's reasons sufficient to raise a genuine issue

12   of material fact as to whether the reasons were pretextual)).

13   While Tandon asserts that GN did not mention his performance deficiencies until this

14   lawsuit arose, the Court finds that GN offering this additional reason for Tandon's termination is

15   not incompatible with its earlier assertion that Tandon's position was eliminated. Indeed,

16   Reisinger testified that the decision to eliminate Tandon's position was based on a "totality of

17   circumstances," including the desire to remove middle management, the diminishing focus on

18   Cisco, and deficiencies in Tandon's leadership capabilities and collaboration skills compared to

19   other members of the team. Reisinger Dep. 94:4-97:14. Thus, the Court does not agree that there

20   are any discrepancies in GN's rationale for terminating Tandon and does not find that the "shifting

21   stories" Tandon identifies provide evidence of pretext.

22   Tandon next argues that GN's claim that the group was restructured as part of a strategy

23   shift is pretextual because Tandon's position was not actually eliminated. GN asserts that

24   Tandon's position has not been replaced or filled since he was terminated. Reisinger Decl. ¶ 25.

25   Tandon disputes this fact because a Caucasian Strategic Alliances Manager, Stephan Keim, "took

26   over Tandon's job duties, including his Cisco account." Opp. at 18. Though he does not cite to

United States District Court
Northern District of California

evidence in his Opposition, in his Separate Statement of Disputed Material Facts Tandon cites to Exhibits 11 and 39 to support this argument.  Plaintiff's Statement of Disputed Material Facts, at 17.  Exhibit 11 (an organizational chart) and 39 (Keim's LinkedIn profile) show that Keim is Caucasian and was an existing employee in the Strategic Alliances group in a position junior to Tandon at the time Tandon was terminated.  Neither of these exhibits indicate that Keim replaced Tandon.  Tandon also points to an email announcement that Reisinger drafted following Tandon's termination, which states: "Stephan Keim will cover any open items and transition from Ritesh's responsibilities for the Cisco partnership and their alliance partners."  Reisinger Decl. Ex. E; *see also* Reisinger Decl. ¶ 18.  But the fact that Tandon's responsibilities for the Cisco account were redistributed to a more junior employee is not inconsistent with the fact that Tandon's position was eliminated.  On the contrary, Keim taking over Tandon's responsibilities is consistent with Reisinger's testimony that part of why Tandon's position was eliminated was precisely because it was unnecessary to have an employee "solely focusing on one vendor, like Cisco" and because the "middle management layer" was unnecessary overhead.  Reisinger Dep. 94:22-96:13.

Tandon further argues that GN attempted to replace him, citing to (1) an email sent one month before Tandon was terminated in which Mr. Reisinger requested assistance with "recruitment of replacement" (Le Decl., Ex. 22), and (2) a screenshot of a LinkedIn post appearing to advertise for a position in the "Business Development & Alliances" group at GN (Le Decl. Ex. 34).  At best, these exhibits show that Reisinger considered replacing Tandon and that GN considered hiring someone for a different position in a different business unit around the same time.  Neither exhibit offers any evidence that Tandon was replaced or even that GN tried to replace him, such that a reasonable juror could conclude that GN's assertion that Tandon's position was eliminated is false.

Next, Tandon argues that GN's reasons for terminating him are pretextual because this litigation is the first time GN raised any issue regarding Tandon's performance of skills.  He argues that he received "zero counseling for any of the alleged performance deficiencies that [GN]

United States District Court
Northern District of California

1   now attempts to assert," and that he received a positive performance review in 2016.  Opp. at 19.

2   As an initial matter, GN is not required to show that it gave Tandon notice of his performance

3   deficiencies or that it provided him with counseling to address those deficiencies.  Thus, the

4   absence of such counseling is not evidence of pretext.  Moreover, Tandon does not dispute that he

5   was given at least one warning, documented in multiple emails, following a series of

6   unprofessional emails to coworkers in 2015.  Copeland Decl. Exs. E-F; Reisinger Decl. ¶ 19 & Ex.

7   C.  Reisinger further testified that he had regular conversations with Tandon about his various

8   deficiencies.  Reisinger Dep. 65:6-67:19; Reisinger Decl. ¶¶ 34-35.

9          Tandon argues that there is no evidence to support Reisinger's conclusion that he lacked

10   the software skills in light of GN's shift in strategic focus towards software, however, Reisinger

11   specifically testifies that he reached this conclusion based on his analysis of Tandon's skills and

12   performance.  Reisinger Decl. ¶¶ 13-20.  Tandon's own assertion that he possesses the required

13   skills is not enough to create a genuine issue of material fact as to pretext.  *See Buhl*, 817 F. App'x

14   at 411 (finding that plaintiff's technical disagreements with his manager and "his own subjective

15   belief" that his employer's concerns about his performance were overblown were insufficient to

16   raise a genuine issue of fact.); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir.

17   1996) ("an employee's subjective personal judgments of her competence alone do not raise a

18   genuine issue of material fact"); *Hicks v. KNTV Television, Inc.*, 160 Cal. App. 4th 994, 1005, 73

19   Cal. Rptr. 3d 240 (2008) (employer's subjective assessment is entitled to credence even if it

20   departs from employee's).

21          Tandon raises several other arguments with respect to pretext which do not include

22   citations to the record and which the Court does not find persuasive.  For example, Tandon argues

23   that the absence of corroborating documentation for GN's reasons for terminating him give rise to

24   an inference of pretext; however, it is Tandon's burden to show pretext, not GN's burden to

25   disprove it.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407

26   (1993) ("A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that

27

28   Case No.: 5:19-cv-00212-EJD
     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the reason was false, and that discrimination was the real reason.").  The Court finds that Tandon

2   has not produced "specific and substantial evidence showing that [GN's] justification for

3   termination is unworthy of credence, such that a trier of fact could reasonably conclude [GN's]

4   proffered justification was a pretext for retaliation."  *Morris v. Charter Commc'ns, Inc.*, 788 F.

5   App'x 532, 533 (9th Cir. 2019) (citing *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d

6   1276, 1284 (9th Cir. 2001); *see Brown v. City of Tucson*, 336 F.3d 1181, 1188 (9th Cir. 2003)

7   ("circumstantial evidence of pretext must be specific and substantial in order to survive summary

8   judgment") (cleaned up).

9       Because Tandon has not offered sufficient evidence to suggest pretext, GN is entitled to

10   summary judgment on Tandon's retaliation claims.

### iv.  Harassment

12       Under FEHA, harassment and discrimination fall under separate statutory prohibitions.

13   *See* Cal. Gov't Code § 12940(a), (j)(1); *Pinder*, 227 F. Supp. 3d at 1143.  Consequently, California

14   courts have distinguished harassing acts from discriminatory acts.  *Reno v. Baird*, 18 Cal. 4th 640,

15   645–47, 957 P.2d 1333 (1998).  Unlike discrimination claims, harassment "consists of actions

16   outside the scope of job duties which are not of a type necessary to business and personnel

17   management." *Reno*, 957 P.2d at 1337; *see also Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th

18   55, 53 Cal. Rptr. 2d 741, 746 (1996).  For example, "commonly necessary personnel management

19   actions such as hiring and firing, job or project assignments, . . . promotion or demotion, [and]

20   performance evaluations, . . . do not come within the meaning of harassment." *Lawler*, 704 F.3d at

21   1244 (quoting *Reno*, 957 P.2d at 1336).

22       To establish a prima facie case of a racially hostile work environment, Tandon must show

23   that: (i) he "belongs to a protected group;" (ii) he was "subjected to unwelcome harassment

24   because of being a member of that group;" and (iii) "the harassment was sufficiently severe or

25   pervasive to alter the conditions of employment and create an abusive working environment."

26   *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 703 (N.D. Cal. 2014); *Kelly-Zurian v. Wohl*

27   Case No.: 5:19-cv-00212-EJD
28   ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

*Shoe Co.*, 22 Cal. App. 4th 397, 409, 27 Cal. Rptr. 2d 457 (1994), *as modified* (Mar. 4, 1994) ("When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, the law is violated."); *see also Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 876–77, 112 Cal. Rptr. 3d 377 (2010) (claim requires conduct that "would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee").  The assessment of whether conduct qualifies under this standard is based on the totality of the circumstances, including: "(1) the nature of the unwelcome . . . acts or works . . .; (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occur[red]; and (4) the context in which the . . . harassing conduct occurred."  *Fisher*, 214 Cal. App. 3d at 609.

Tandon argues that he has established a prima facie case of harassment based on the conduct of Gray and the marketing team as well as the conduct of Reisinger.  With respect to Gray, Tandon argues that he faced harassment because (1) Gray told him that she "hated Indians," (2) Gray excluded him from "key meetings," (3) he did not receive support from the marketing team, and (4) during company events, Gray "openly insult[ed] him in front of others."  Opp. at 24.

GN first argues that Tandon mischaracterizes his own testimony with respect to that allegation that Gray hated Indians.  In his Opposition, Tandon repeatedly highlights that Gray "told him that she ***hated Indians***."  Opp. at 4 (emphasis in original) *see also id.* at 3, 12, 24.  The portions of his deposition cited for this assertion, however, consist of the following exchange:

> [Defense counsel]: . . . with respect to this particular aspect of what you believe to be discrimination, this not inviting you to meetings, why do you believe that that was because of your ancestry, national origin, race, what you referred to as your skin color?
> . . .
> [Tandon]:  She hated Indians.
> Q:  And why do you believe that?
> A:  If you're looking to history of India and U.K., there is some history on that account.  And pretty much – pretty much I can say that she was carrying something, and what is there on her background, I don't know.  But what is there on her, I can say that she hates Indians.

Q:  Did she ever tell you that she hated Indians?
A:  I'm trying to recall, because some of the language what she has used while we were talking during the first time, and I can say that, to my best recall, answer is yes.
. . .
Q:  . . . what exactly did she say that made you think that she had a prejudice against people with you color skin?
A:  I don't recall it.
. . .
Q:  To the best of your knowledge, she said something that you can't recall that made you think that she had prejudice against Indian people?
A: Yeah, definitely.

Tandon Dep. 78:2- 79:17.  The assertions in the Opposition also contradict the declaration Tandon submitted in support, wherein he states that Gray "said something to me which was apparent that she does not like Indians."  Tandon Decl. ¶ 7.  At best, Tandon's testimony supports the assertion that Tandon *believes* Gray hates Indians based on a comment she made in 2014 or 2015, which he cannot specifically recall.  While Gray's comment may constitute unwelcome harassment, it does not, without more, rise to the level of "severe or pervasive."  *See Lawler*, 704 F.3d at 1245 *("*a single incidence of the 'gruff,' 'abrupt,' and 'intimidating' behavior [plaintiff] described is not sufficiently severe to constitute a hostile working environment."); *Hughes v. Pair*, 46 Cal. 4th 1035, 1043–44, 1048–49, 209 P.3d 963 (2009) (incidents that are "occasional, sporadic, isolated, or trivial" cannot support a FEHA harassment claim) (citation omitted).

Tandon also does not cite to any examples of Gray "openly insult[ing] him in front of others" in his Opposition.  In his deposition testimony, Tandon discussed several examples of Gray's conduct.  First, at a work-related conference in 2017, Gray was greeting each guest at the door of a reception, but she did not greet Tandon and turned away from him when he tried to engage with her.  Tandon Dep. 81:5-82:20.  Another time, at the global leadership meeting in 2017, Tandon was speaking to GN Vice President of Sales, Mark Derby, but Derby left the conversation to speak to Gray and the two of them laughed in Tandon's direction.  *Id.* at 84:4-24.  Tandon more broadly testified that there were "tons of instances" when Gray ignored him or made facial expressions toward him that he found insulting.  *Id.* at 81:5-14.

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

22

1    The Court finds that these instances are not sufficiently severe or pervasive to create a

2  working environment that a reasonable person would find hostile.  The two specific examples

3  Tandon gave occurred during social situations at destination work conferences.  In that context,

4  Gray's behavior might be considered rude or unwelcoming, but not hostile or abusive.  *Jones v.*

5  *Dep't of Corr. & Rehab.*, 152 Cal. App. 4th 1367, 1377, 62 Cal. Rptr. 3d 200, 208 (2007) ("The

6  requirement that the conduct be sufficiently severe or pervasive to create a working environment a

7  reasonable person would find hostile or abusive is a crucial limitation that prevents . . . harassment

8  law from being expanded into a 'general civility code.'") (quoting *Oncale v. Sundowner Offshore*

9  *Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)); *Aguilar v. Avis Rent A*

10  *Car Sys., Inc.*, 21 Cal. 4th 121, 131, 980 P.2d 846 (1999) (the plaintiff must show a "concerted

11  pattern of harassment of a repeated, routine or a generalized nature.") (citation omitted).

12    GN argues that the remainder of the actions by Gray and the marketing team that Tandon

13  takes issue with are not actionable because they involve "personnel management actions" that fall

14  outside the meaning of harassment under FEHA.  Mot. at 18.  Tandon alleges that Gray did not

15  invite him to certain meetings, cancelled or postponed multiple meetings with him, and refused to

16  allocate marketing resources to his projects.  The Court agrees that such actions were "inherently

17  necessary" to Gray's role as a Senior Director in GN's Channel and Retail Marketing team.

18  *Janken*, 46 Cal. App. 4th at 62–63; *Reno*, 18 Cal. 4th at 646–47 ("commonly necessary personnel

19  management actions such as hiring and firing, job or project assignments, office or work station

20  assignments, promotion or demotion, performance evaluations, *the provision of support*, the

21  assignment or nonassignment of supervisory functions, *deciding who will and who will not attend*

22  *meetings*, deciding who will be laid off, and the like, do not come within the meaning of

23  harassment.") (emphasis added).  Thus, the Court finds that Gray's failure to invite Tandon to key

24  meetings and her lack of support for Tandon's projects, even if true and supported by evidence,

25  are not actionable as harassment under FEHA.  *See Lawler*, 704 F.3d at 1245 (finding that

26  defendant criticizing plaintiff's work, instructing her to perform work-related assignments, and

27  Case No.: 5:19-cv-00212-EJD

28  ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

23

disagreeing with the way plaintiff performed certain tasks were all "conduct relate[d] to business operations" and, therefore, could not constitute harassment under FEHA).

Moreover, other than Gray's unspecified comment that led Tandon to believe she hated Indians, Tandon offers no evidence to suggest that Gray's conduct towards him was because of his race, national origin or ancestry. The "absence of the nexus" between Gray's alleged conduct and Tandon's race, national origin, or ancestry negates his FEHA harassment claim. *Jones*, 152 Cal. App. 4th at 1378.

With respect to Resinger's alleged conduct, Tandon argues that he has established a prima facie claim for harassment based on Resinger's preferential treatment of Terp. Tandon alleges that Resinger included Terp but not Tandon in key meeting and allowed Terp to lead meetings. Tandon more generally asserts that he was "not given the same opportunities for praise, promotions, and invitations to participate in company events and meetings from Resinger who presented these opportunities to Terp, who is of Danish descent." Opp. at 24. Tandon acknowledges that "many of the facts making up Tandon's claim is of the 'official employment actions' and 'managerial conduct' variety" but argues that "such actions have been recognized as sufficient for purposes of establishing a viable harassment claim," relying on *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 709, 219 P.3d 749 (2009), *as modified* (Feb. 10, 2010). In *Roby*, the California Supreme Court held that the lower courts should not have excluded official employment actions from their consideration of Roby's harassment claim where those actions "may have contributed to the hostile message that [the employer] was expressing to Roby in other, more explicit ways." *Id.* at 763. Unlike in *Roby*, there is no evidence of more explicit harassing conduct to suggest an underlying message of hostility toward Tandon.

Moreover, the employment actions at issue in *Roby* were more severe and more pervasive than those in this case. *Id.* (noting that the employer shunned Roby during staff meetings, belittled Roby's job, and reprimanded her in front of coworkers, among other things). Tandon's allegations that "Resinger [r]epeatedly [d]isregarded Tandon in the [w]orkplace" are more aptly described as

United States District Court
Northern District of California

"snubbing by supervisors," which courts have repeatedly held does not constitute harassment under FEHA.  *Shanks v. Labs.*, No. 5:15-CV-01151-EJD, 2016 WL 3940923, at *8 (N.D. Cal. July 21, 2016) (citing *Cozzi v. Cty. of Marin*, 787 F. Supp. 2d 1047, 1067–68 (N.D. Cal. 2011) and *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).

The Court finds that Tandon has not presented sufficient evidence to state a prima facie case of harassment based on either Gray's or Reisinger's conduct.  The Court, therefore, GRANTS GN's Motion as to Tandon's harassment claim.

### c.  Section 1102.5

Tandon also asserts a whistleblower retaliation claim under California Labor Code Section 1102.5 ("Section 1102.5").  Section 1102(b) prevents an employer from retaliating against an employee for disclosing information to a person with authority over the employee, if the employee has reasonable cause to believe that the information discloses a violation of a state, federal, or local law.  Cal. Lab. Code § 1102.5(b).  Section 1102.5(c) prevents an employer from retaliating against an employee for refusing to "participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Cal. Lab. Code § 1102.5(c).

To state a prima facie claim for retaliation under Section 1102.5, a plaintiff must show (i) he engaged in protected activity; (ii) his employer subjected him to an adverse employment action; and (iii) there is a causal link between the two.  *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384, 37 Cal. Rptr. 3d 113 (2005).  If a plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nonretaliatory explanation for the adverse employment action.  *Id.*  If the defendant satisfies its burden, the burden shifts back to the plaintiff to show pretext.  *Id.*

"Protected activity" under Section 1102.5(b) requires: (1) a disclosure; (2) based on reasonably based suspicions; (3) of illegal activity.  *Killgore v. Specpro Prof'l Servs., LLC*, No.

1   5:18-CV-03413-EJD, 2019 WL 6911975, at *5 (N.D. Cal. Dec. 19, 2019) (citing *Johnson v. Johns*

2   *Hopkins Univ. Applied Physics Lab. LLC*, No. 12CV1717 JM BLM, 2013 WL 4046668, at *6

3   (S.D. Cal. Aug. 8, 2013)). "To have a reasonably based suspicion of illegal activity, the employee

4   must be able to point to some legal foundation for his suspicion—some statute, rule or regulation

5   which may have been violated by the conduct he disclosed." *Turner v. City & Cty. of San*

6   *Francisco*, 892 F. Supp. 2d 1188, 1199–1200 (N.D. Cal. 2012) (citation omitted). Tandon need

7   only show a "genuine and reasonable concern" that GN was engaged in unlawful activity to be

8   protected as a whistleblower. *McVeigh v. Recology San Francisco*, 213 Cal. App. 4th 443, 152

9   Cal. Rptr. 3d 595, 608 (2013).

10      Tandon argues that he engaged in protected activity by (1) reporting his belief that Caule

11  misappropriated Microsoft's confidential information, and (2) refusing Reisinger's request that he

12  provide "monkey code" to Google. The Court considers each alleged protected activity in turn.

### i. Reporting Misappropriation of Microsoft Information

14      Tandon's direct report, Mauro Caule, worked closely with Microsoft in the Seattle area and

15  as part of that relationship, was granted "badge access" at Microsoft. With badge access, Caule

16  was able to enter the Microsoft campus and also access Microsoft's intranet while there. Tandon

17  asserts that Caule used his intranet access to view Microsoft's confidential information, such as

18  "sales pipeline information" and information regarding new Microsoft projects. Tandon Dep.

19  136:10-140:14. Although Tandon acknowledges that Microsoft intentionally granted Caule access

20  to the intranet, he believes that Caule had more access than Microsoft intended to give because

21  "no companies give such access and information." Tandon Dep. 149:6-149:20. Caule sent this

22  information to Tandon, Reisinger, and GN executives. Tandon complained to Reisinger

23  approximately three times about his belief that Caule was stealing confidential information, but his

24  complaints all went unanswered. *Id.* at 150:9-153:6. Tandon maintains that these complaints

25  constitute protected activity under Section 1102.5.

26      GN argues that these complaints do not constitute protected activity because Tandon's

United States District Court
Northern District of California

United States District Court
Northern District of California

suspicions were based on nothing more than "his own *personal* understanding about what information business generally share with their partners." Mot. at 22. The Court agrees. While Tandon may have believed that Caule's conduct was improper, he has not provided any evidence or articulated any basis for that belief. For example, he has not provided any evidence to support his belief that Microsoft made a mistake in granting Caule access to certain information, and absent any evidence, the Court does not find that belief reasonable.

Moreover, Tandon did not articulate a suspicion that Caule's conduct was in violation of a specific statute, rule, or regulation. Tandon's Opposition mentions that Caule's actions were "potentially in violation of the Computer Fraud and Abuse Act and/or the Uniform Trade Secrets Act," but he provides no evidence to suggest that he knew of these statutes at the time of his disclosures, nor is there any explanation as to how Caule's actions may have violated them. *See* Opp. at 14. Thus, the Court finds that Plaintiff had no "legal foundation for his suspicion" that Caule's actions were illegal. *See Turner*, 892 F. Supp. 2d at 1199–1200; *Killgore*, 2019 WL 6911975, at *8 ("while an employee's disclosure needs not expressly state the legal violation, it must provide sufficient detail such that the disclosure identifies the supposed legal violation."). Thus, Tandon the Court finds that Tandon did not have a reasonably based suspicion of illegality with respect to Caule's actions and his disclosures on the topic do not constitute protected activity.

### ii.  Refusing to Provide "Monkey Code"

Tandon next argues that his refusal to provide Google with "monkey code" was protected activity under Section 1102.5. In June through November of 2017, Google and GN were working on a potential opportunity to share device software as part of a larger business project. Tandon Dep. 224:24-226:15. As part of this process, Google requested that GN send Google specific software code, which GN engineers refused to send. According to Tandon, Reisinger instructed Tandon to produce fake code, known as "monkey code," to placate Google and preserve further business prospects. *Id.* 227:10-16. Tandon testified that he refused to provide Google with fake code because he believed it was "highly illegal." *Id.* 227:18-230:13.

Case No.: 5:19-cv-00212-EJD
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

1    GN argues that Tandon's refusal in these circumstances is not protected activity because it

2    would not have resulted in a violation of state or federal statute, or a violation of or noncompliance

3    with a local, state, or federal rule or regulation.  Mot. at 21.  Rather, Tandon's concerns about

4    providing monkey code amount at most to concern that GN would breach its contract with

5    Google. The Court agrees.  In his deposition, Tandon was asked why he believed this conduct to

6    be illegal, and he stated:

> "we should not break our trust with any partners.  And we should not do the
> wrong things because once you do the wrong thing, it's going to come up
> and back again and going to bite. . . . it is not lawful because what Google is
> asking, we are not offering them . . . We cannot just make it fake and give
> the things to get our job done.  And it's not fair on the Google side. . . . As
> per the documentation and agreement, what Google was seeking, it need to
> be the actual code.  And here we are falsifying information and putting any
> code.  So that's why it's illegal."

12   *Id.* at 228:23-229:1.  When asked "[i]s it fair to say you think it's unlawful because it would have

13   breached the agreement with Google?" Tandon replied, "[y]es."  *Id.* at 230:15-20.

14   A breach of contract is not a violation of a statute, rule, or regulation and cannot give rise

15   to a Section 1102.5 claim.  *See Love v. Motion Indus., Inc.*, 309 F. Supp. 2d 1128, 1134 (N.D. Cal.

16   2004) (finding that Plaintiff failed to establish protective activity because he "failed to allege any

17   specific federal or state violation stemming from [his] safety concerns," which were based on

18   subcontractor's specifications); *see also Lillie v. ManTech Int'l. Corp.*, No.

19   217CV02538CASSSX, 2019 WL 3387732, at *19 (C.D. Cal. July 26, 2019), *aff'd sub nom. Lillie*

20   *v. ManTech Int'l Corp.*, No. 19-55891, 2020 WL 7054393 (9th Cir. Dec. 2, 2020) (in the context

21   of a retaliation claim under the Defense Contractor Whistleblower Protection Act, finding no

22   protected activity where "[t]he most that could be found about plaintiff's disclosures indicates that

23   he believed that [defendant] had violated a contractual agreement . . . However, the Court is aware

24   of no authority which supports the proposition that a breach of contract could constitute a violation

25   of a law, rule, or regulation").

26   Because Tandon has not established that his reservations about providing Google with

United States District Court
Northern District of California

1   "monkey code" reflect reasonably based suspicions of illegal activity, the Court finds that his

2   refusal to provide such code is not protected activity.  Thus, Tandon has failed to establish that he

3   engaged in any protected activity sufficient to state a prima facie case for retaliation under Section

4   1102.5.  The Court, therefore, GRANTS GN's Motion as to Tandon's Section 1102.5 claim.

### d.  Negligent Hiring, Supervision, and Retention

6          Tandon brings a related claim for negligent hiring, supervision, and retention on the basis

7   that GN failed to supervise its managers and employees closely to ensure that they would refrain

8   from harassing and retaliating against Tandon.  GN argues that this claim in barred by the

9   workers' compensation exclusivity provision of California labor law.  A negligent supervision

10   claim is subject to workers' compensation exclusivity provisions where a plaintiff "seeks to

11   recover for an industrial personal injury sustained in and arising out of and in the course and scope

12   of employment," and where the "acts and motives allegedly giving rise to the injury constitute a

13   risk reasonably encompassed within the compensation bargain." *Stiefel v. Bechtel Corp.*, 497 F.

14   Supp. 2d 1138, 1153 (S.D. Cal. 2007); *see also Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*,

15   14 Cal. App. 4th 1595, 1605–06, 18 Cal. Rptr. 2d 692 (1993), *as modified on denial of reh'g* (May

16   12, 1993) (claim against employer for negligent supervision in connection with alleged sexual

17   harassment and wrongful termination of employee is barred by workers' compensation exclusivity

18   principle); *Hine v. Dittrich*, 228 Cal. App. 3d 59, 63, 278 Cal. Rptr. 330 (Ct. App. 1991), *modified*

19   (Mar. 25, 1991) (stating that the exclusivity of the workers' compensation remedy might preclude

20   a civil suit for negligent supervision of third-party employees in some or all cases).

21          Tandon argues that the exclusivity rule only applies "if the conduct is a 'normal risk' [of]

22   employment, which FEHA violations are not."  Opp. at 25 (citing *Farmers Ins. Grp. v. Cty. of

23   Santa Clara*, 11 Cal. 4th 992, 906 P.2d 440 (1995)).  For the reasons stated above, the Court does

24   not find that the conduct Tandon challenges constitutes FEHA violations.  Moreover, courts have

25   found that  "even 'severe emotional distress' arising from 'outrageous conduct' that occurred 'at

26   the worksite, in the normal course of the employer-employee relationship' is the type of injury that

United States District Court
Northern District of California

1    falls within the exclusive province of workers' compensation."  *Yau v. Santa Margarita Ford,*

2    *Inc.*, 229 Cal. App. 4th 144, 161–62, 176 Cal. Rptr. 3d 824, 837 (2014) (quoting *Miklosy v.*

3    *Regents of Univ. of California*, 44 Cal. 4th 876, 188 P.3d 629 (2008)).

4        Accordingly, the Court GRANTS GN's Motion as to Tandon's negligent supervision

5    claim.

6        **e.  Derivative Claims**

7        Tandon brought several claims that are derivative of his prior substantive claims, including

8    a claim for wrongful termination in violation of public policy (claim two); failure to prevent

9    discrimination, harassment, and retaliation in violation of FEHA (claim four); and IIED (claim

10   five).  *See Alejandro v. ST Micro Elecs., Inc*, 178 F. Supp. 3d 850, 864 (N.D. Cal. 2016) (granting

11   summary judgment to employer on derivative failure to prevent claim after granting summary

12   judgment on underlying discrimination claims); *Aline v. Gen. Elec. Co.*, No. 95-20775 SW, 1997

13   WL 195435, at *4 (N.D. Cal. Apr. 16, 1997) (because plaintiff could not show unlawful

14   discrimination under FEHA, "his claim for wrongful termination in violation of public policy,

15   based on violation of that statute, cannot stand") (citation omitted).

16       Tandon acknowledges that his failure to prevent claim "is derivative of discrimination,

17   harassment and retaliation."  Opp. at 25.  Similarly, he acknowledges that his "IIED claim is

18   predicated on his being subjected to discrimination and harassment in the workplace" and that his

19   wrongful termination claim "encompasses not only his FEHA claims, but also his 1102.5 claim).

20   *Id.* at 16, 25.  Having already concluded that Tandon cannot establish that he was subject to

21   discrimination, retaliation, or harassment in the workplace, the Court finds that GN is entitled to

22   summary judgment on Tandon's failure to prevent, wrongful termination and IIED claims.

23   **IV.   Conclusion**

24       For the reasons state above, the Court **GRANTS** the Motion for Summary Judgment in

25   full.  Because this order represents a final resolution of all the claims, judgment will be entered in

26   favor of GN and the Clerk of Court will close this case.

27
     Case No.: 5:19-cv-00212-EJD
28   ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    **IT IS SO ORDERED.**

2    Dated:  January 25, 2021

3

4    _____
     EDWARD J. DAVILA
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
     Case No.: 5:19-cv-00212-EJD
28   ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California